IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Lisa Whaley Perry, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>Carolyn W. Colvin, Acting )<br>Commissioner of Social Security, )<br>)<br>Defendant. )<br>) | Civil Action No. 6:13-3608-MGL-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a)(D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on June 10, 2010, alleging that she became unable to work on December 10, 2009. The applications were denied initially and on reconsideration by the Social Security Administration. On September 12, 2011, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Josephine A. Doherty, an impartial vocational expert, appeared on July 31, 2012,

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

considered the case *de novo*, and on August 30, 2012, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on November 1, 2013. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1) The claimant meets the insured status requirements of the Social Security Act through March 31, 2014.
>
> (2) The claimant has not engaged in substantial gainful activity since December 10, 2009, the alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> (3) The claimant has the following severe impairments: bipolar disorder, schizoaffective disorder, and right hand injury (20 C.F.R. §§ 404.1520(c) and 416.920(c)).
>
> (4) The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).
>
> (5) After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). except the claimant cannot climb ladders or scaffolds; crawl; or perform fingering or handling with the right upper extremity. The claimant is further limited to the performance of simple, routine, repetitive tasks with no contact with the general public.
>
> (6) The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).
>
> (7) The claimant was born on March 3, 1968, and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

>(8)     The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).
>
>(9)     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).
>
>(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).
>
>(11)    The claimant has not been under a disability, as defined in the Social Security Act, from December 10, 2009, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

>the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged

in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith*

*v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was seen by John A. McFadden, M.D., of Charleston Hand Group on July 28, 2009 for a new patient consultation (Tr. 198-99). She reported diffuse pain and stiffness in her right hand. On examination, she presented with her right hand covered by a tissue. She had been wearing two splints and an Ace bandage, which had been very tightly bound. She reported that if she did not brace the hand, it quickly became swollen. Motion testing could not be done because she complained of severe pain. Dr. McFadden felt that her wrapping of the hand was contributing markedly to her problem. She was told in strong terms to discard and discontinue any wrap. He agreed to see her after physical/occupational therapy, if it was approved.

On August 24, 2009, the plaintiff was seen by Claire H. Apple, OTR/L, a therapist at Sports Plus, for an initial physical therapy evaluation (Tr. 201-03). The plaintiff presented with a homemade bandage on her right hand. On examination, she had decreased wrist extension and flexion as well as decreased radial and ulnar deviation. The

plaintiff reported paresthesias over the radial and ulnar nerve distribution.  The therapist noted that the plaintiff would benefit from occupational therapy three times per week for four to six weeks to address range of motion, hypersensitivity, and decreased functional use of the right hand.

Dr. McFadden saw the plaintiff at a follow-up on February 9, 2010 (Tr. 197).  She complained of progressive discoloration of her fingers.  Dr. McFadden noted severe dermatitis and hyperkeratosis with fissuring.  He could not fully straighten her fingers because of the issue with her skin.  She stated she was no longer wrapping her hand, per his prior instructions.  He recommended a dermatology consultation.

The plaintiff presented to the Roper St. Francis Northwoods emergency department on February 18, 2010, with complaints of pain in her right arm and forearm that had begun that morning (Tr. 208-14).  She was examined by an emergency room nurse who observed warmth, edema, and difficulty using the arm.  The plaintiff was treated for cellulitis.  She was given antibiotics and told to use warm compresses.

The plaintiff was admitted to Palmetto Lowcountry Behavioral Health ("Palmetto") from February 28, 2010, to March 9, 2010 (Tr. 228-29, 233-35).  She had been evaluated by the Mobile Crisis Unit of Charleston Mental Health at the International House of Pancakes after she refused to leave after ordering a meal and staying there for over 24 hours.  The plaintiff was responding to internal stimuli and admitted to hearing voices.  Her thought process was disorganized, and she had grandiose delusions of being a millionaire.  These symptoms persisted when she was taken to Palmetto, but subsided after she agreed to take Risperdal.  She was ordered by the probate court to attend outpatient mental health treatment for three years.  Discharge diagnoses were psychosis not otherwise specified,

schizophreniform disorder versus brief psychotic disorder versus schizophrenia. Her Global Assessment of Functioning ("GAF") on discharge was estimated to be 55.[2]

A nurse practitioner's note from the Berkeley County Mental Health Center ("BCMHC") dated March 16, 2010, indicates that the plaintiff already had an open case at the Charleston Mental Health Department and that she had transferred to Berkeley County (Tr. 268). She had been prescribed medication following her release from Palmetto but was unfunded and was given samples. The nursing staff planned to facilitate her medication until she could be seen for an initial formal evaluation by a staff psychiatrist.

Ray Hodges, M.D., of BCMHC, evaluated the plaintiff on March 31, 2010. The plaintiff reported that she was "tricked" into coming by her family. She was scheduled for an intake evaluation about two weeks later. She refused to take the samples given to her because they were a different shape and color from her previous medication. The plaintiff refused to return to BCMHC and called the police claiming she was being evicted from her home by her family. She was mildly agitated with slightly pressured speech and was somewhat tangential. She presented with an open briefcase bulging with manilla envelopes, which she said were song lyrics that she hoped to get published. Dr. Hodges opined that the plaintiff was manic without signs of gross psychosis. She was reassured about the medication given to her and agreed to take it. He noted, however, that she refused to enter the building and that he evaluated her in the parking lot of the clinic with her family and two police officers present. Dr. Hodges did not feel that she needed commitment, and her family was eventually persuaded to take her home (Tr. 267).

---

[2]A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*"). A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id.* A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* A GAF schore between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. *Id.*

On May 6, 2010, the plaintiff was formally evaluated at BCMHC. She claimed not to know why she was there and became irritable when confronted with the circumstances regarding her admission to Palmetto. The plaintiff was initially open to questions but became increasingly avoidant, mildly belligerent, and at times somewhat hostile. She exhibited poor judgment, extremely poor insight, and her intellect was estimated to be below average. Impression was psychosis not otherwise specified, rule out bipolar disorder, personality disorder traits, and her GAF could not be determined. She was encouraged to maintain compliance with her prescribed Risperdal (Tr. 266).

On June 24, 2010, the plaintiff was "doing well" and denied any mood symptoms or psychotic symptoms. She reported that she slept and ate well. She brought in a large bag, which she stated was "books I'm working on." She explained that she wrote all day. She brought in a schedule she made for herself. When asked about her commitment at Palmetto, she stated it was a misunderstanding and that she was arrested "for no reason." The plaintiff denied ever hearing voices. She stated that she was compliant with her medication, but was not sure why she had to take it. Speech was pressured, and insight and judgment were poor. Her GAF was estimated to be 55 (Tr. 264).

On August 31, 2010, Akeya Harrold, N.P., of BCMHC, noted that the plaintiff had missed several appointments and showed up five hours early to another. The plaintiff spoke about her writing, stating that she wrote novels, a cookbook, short plays, comics, and was developing a video game. Nurse Harrold noted that her drawings were very child-like in appearance. She worked all night as there was "too much activity during the day." The plaintiff stated that others did not understand her, so she largely stayed to herself. She endorsed a very good mood. She was a bit disheveled with pressured speech and circumstantial thought process. Insight and judgment were fair to poor. She was encouraged to continue Risperdal and given Depakote for mood stabilization (Tr. 262).

On November 8, 2010, an x-ray of the plaintiff's right hand showed mild degenerative narrowing of the third through the fifth metacarpophalangeal joints (Tr. 244). That same day, Maribel Rodriguez-Scott, D.O., evaluated the plaintiff at the request of the state agency (Tr. 245-46). The plaintiff reported a right hand injury due to overuse. She had not had any treatment in about a year. She did not think she could lift ten pounds. The plaintiff did not drive, used her left hand to do household chores, and stated that she had learned to write with her left hand. On examination, the plaintiff had 1/5 motor strength in the right hand and wrist. She had significantly decreased range of motion and significant atrophy of the right hand. She was wearing a splint when she presented for the exam, which she removed to be evaluated. Dr. Rodriguez-Scott's impression was right hand injury overuse syndrome with significant muscle atrophy, which needed appropriate follow-up (Tr. 245-46).

On December 21, 2010, Isabella McCall, M.D., a medical consultant for the state agency, reviewed the plaintiff's file. Dr. McCall opined that the plaintiff's non-compliance with medical advice and treatment (to remove the splint) had contributed to the worsening of her condition. She found that it was reasonable to restrict the plaintiff from fine and gross manipulation as well as pushing and pulling with her right hand (Tr. 248-54).

In December 2010, the plaintiff returned to BCMHC and was confronted about missing several appointments. She stated that she had attended past appointments, but no one ever told her counselor that she was there waiting to be seen (Tr. 260). The plaintiff had been out of medication for a few months. She felt that Depakote made her feel like she wasn't herself. She was upset due to a letter from the probate court that had been sent because BCMHC staff had notified the court of her noncompliance with appointments and medication. The plaintiff said she had transportation trouble and reported living in a camper on her family's property. She endorsed mood swings with periods of sadness, isolation, and crying and then periods of happiness and increased energy during which she would

work "day and night" on books she was writing with very little sleep. Her presentation was as before. The plaintiff agreed to restart her medications and give Depakote a proper trial.

On January 26, 2011, the plaintiff attended her scheduled appointment and stated that she had ridden her bicycle to a friend's home who then drove her to BCMHC. The plaintiff had taken her medications, although she reported that she emptied the Depakote from its capsule and into a spoon because it tasted bad. Her mood was "OK," but she felt depressed about finances. She was pleasant that day, but insight and judgment continued to be poor (Tr. 259).

The plaintiff saw her case manager on April 11, 2011, and was "doing well" (Tr. 270-71). She was applying for disability, had a government subsidized phone, and was trying to get assistance for housing. The plaintiff was very hopeful that she would be able to live in the same apartment complex as her daughter. She endorsed improvement on her medications and admitted that they kept her calm. She stated that she felt watched and followed at times and occasionally saw a shadow in her peripheral vision. Her GAF was rated at 60. Lab results dated May 10, 2011, indicate that the plaintiff's Depakote level was subtherapeutic (Tr. 314).

On May 20, 2011, the plaintiff was still focused on getting proper housing. She was living in a camper with no electricity or running water. She admitted feeling depressed, then became tearful, and then stated she was fine. The plaintiff was sleeping more than usual and was no longer working on her books. She had paranoia about people out to get her but then reported that she heard God's and other's voices, which were comforting when she was lonely. Her Depakote level was low despite the fact that she stated she was taking it, and she agreed to an increase. Her GAF was 55 that day (Tr. 272-73).

On June 8, 2011, the plaintiff returned to Dr. McFadden stating that her hand had "collapsed out." Dr. McFadden suspected volar plate contractures, but could not get

10

her to relax enough to do testing. She resisted examination due to pain. Dr. McFadden felt that the plaintiff had a fixed contracture, but that there was nothing to offer her surgically. He suggested independent range of motion testing before assessing a final degree of limitation in regards to her workers' compensation claim (Tr. 342).

On July 15, 2011, the plaintiff was evaluated by Cashton B. Spivey, Ph.D., at the request of the state agency. Dr. Spivey performed a clinical interview and mini-mental status exam. The plaintiff stated that she was applying for disability due to bipolar disorder and a hand injury. She reported some depression regarding her situation and admitted to crying spells but endorsed normal appetite and normal concentration. She denied ever experiencing hallucinations but reported feelings of anxiety and ruminations (Tr. 277-79). The plaintiff told Dr. Spivey that she lived alone in a camper with no running water but that she was independent in caring for herself and her home. She enjoyed writing in her spare time. She obtained a score of 25 of 30 on the mini-mental status exam, which was within normal limits. The plaintiff was unable to restate a sentence or reproduce a drawing. Insight and judgment were judged to be fair, and her intelligence was judged to be in the low average range (Tr. 278). During the evaluation, her mood was sad, and her affect was labile. She cried intermittently. The plaintiff's concentration was fair to poor. Dr. Spivey assessed her with bipolar disorder, anxiety disorder, and a GAF of 55. He felt that she was an individual who may have difficulty managing funds independently and accurately. Dr. Spivey did not indicate that he had access to any of the plaintiff's psychiatric records (Tr. 278-79).

On July 27, 2011, Kathleen Broughan, Ph.D., a medical consultant, completed a psychiatric review technique and mental residual functional capacity ("RFC") evaluation for the state agency. She stated that she gave Dr. Spivey's examination great weight but noted that the plaintiff tended to understate her psychological difficulties and did not appear to be aware of the severity of her psychotic disorder. Dr. Broughan opined that the plaintiff

11

could carry out simple instructions, sustain attention and concentration for two-hour periods of time, should not have ongoing interaction with the general public, would benefit from consistent structure, and could avoid work-place hazards appropriately (Tr. 280-96).

In July 2011, the plaintiff continued to work on securing housing (Tr. 300-01). She was going to relatives' homes at times, because she had no air conditioning. She reported occasional irritability and was still taking her medications and working on her books. The plaintiff returned to BCMHC on September 15, 2011. She had not been seen for a while and was not compliant with appointments or her medication. Nurse Harrold noted, however, that the plaintiff had limited transportation and limited support. Insight and judgment were poor. Nurse Harrold felt that the plaintiff had paranoia regarding medications, BCMHC itself, and others "doing her wrong." The plaintiff was assessed with a GAF score of 60 (Tr. 302-03).

On October 13, 2011, the plaintiff presented with "baseline delusions" (Tr. 304-05). Her GAF was rated at 62, and she was taking her medication regularly at that time. A Plan of Care document executed March 17, 2011, indicates that the plaintiff had been court-ordered to attend treatment and that she "will require services to manage psychosis and prevent decompensation and/or hospitalization" (Tr. 307).

The plaintiff returned to BCMH in March 2012 for the first time since September 2011. She had been to jail during that time for charges of animal cruelty because of how she was keeping her pets. She still related delusions of writing a children's book and programming video games. She felt that the animal cruelty charges would ruin her potential book sales and that the charges were part of a plot to frustrate her success. She reported that there was a device in her food that had been put there by someone who broke into her home to "cut my throat." She felt the animals had been taken away from her to leave her unprotected. She was taking her medications regularly (Tr. 320).

In May 2012, the plaintiff's mood was more variable (Tr. 318-19). She was still not realistic about the situation with her pets. She endorsed increased depression and crying spells as well as racing thoughts and poor sleep. She still felt that she was watched and followed. Her GAF was rated at 55.

*Hearing Testimony*

The plaintiff appeared with her attorney and vocational expert ("VE") Josephine Doherty for a hearing before the ALJ on July 31, 2012 (Tr. 27). The plaintiff identified "sleeping" as the main issue which kept her from working (Tr. 31). The plaintiff stated that she slept excessively due to her medications, which included Risperdal and Depakote. She believed that the Depakote was also making her feet swell (Tr. 33). She was followed at BCMHC every two weeks (Tr. 34). She felt her medications were working "very well" and stated that they had improved her memory and that she was calmer when she took them. She denied any problems getting along with others. When asked about her recent charges for animal cruelty, the plaintiff stated that she "made [the animals] live instead of dying and I got charged for animal cruelty which I thought was cruel. . . . " (Tr. 38).

In addition to her mental impairments, the plaintiff had what she described a condition that caused pain in her right arm and hand (Tr. 32). She stated that her hand was painful and swollen. She had recently been to the hospital for it and had been told not to pick up anything weighing more than three to five pounds (Tr. 31). She confirmed that she used her left hand and arm for everything (Tr 33).

At the time of the hearing, the plaintiff was living in a camper without water or electricity (Tr. 35). She stated that she started her day by waking up, taking her medication and bathing. She spent her time writing books and babysitting a two-year-old grandson. She believed she had designed a video-game and had a fashion show planned to raise money to self-publish a book she had written (Tr. 36-37).

The VE classified the plaintiff's past relevant work as (1) preparation cook - medium, unskilled work, and (2) sales clerk, sandwich shop - light, semi-skilled work (Tr. 39-40).

The ALJ described a hypothetical worker of the plaintiff's age, education and work experience who retained the RFC to perform light work subject to no climbing, crawling, or using the right hand (Tr. 40). The worker was limited to simple, routine, repetitive tasks with no direct interaction with the general public. The VE testified that such restrictions would preclude a worker from performing the plaintiff's past relevant work. However, provided that the worker had fully adapted to using her left hand, there would be light, unskilled employment that such a worker could perform, and identified several representative occupations including shipping/receiving weigher, machine tender, and inserting machine operator (Tr. 40-41).

## **ANALYSIS**

The plaintiff was born on March 3, 1968. She was 41 years old on her alleged disability onset date and was 44 years old on the date of the ALJ's unfavorable decision. She was insured, for the purposes of her Title II application, through March 31, 2014. She has a high school education and past relevant work as a cashier and cook (Tr. 16).

The plaintiff first argues that the ALJ failed to do a proper listing analysis at step three of the sequential evaluation process (pl. brief at 12-16). At step three, the ALJ considered Listings 1.02 (Major dysfunction of a joint(s) (due to any cause)), 12.03 (Schizophrenic, Paranoid, and Other Psychotic Disorders), and 12.04 (Affective Disorders) (Tr. 11-12). Specifically, the plaintiff argues that the ALJ erred with regard to Listings 12.03 and 12.04 in finding that she had only "moderate" limitations in the "paragraph B" areas of social functioning and concentration, persistence, or pace. With regard to social functioning, the ALJ stated: "[T]he claimant has moderate difficulties. The claimant reports getting along with others and was described by the consultative examiner as pleasant and

cooperative. However, the claimant has a history of responding to internal stimuli and grandiose delusions, causing moderate difficulties in this area" (Tr. 11). As noted by the plaintiff, the BCMHC staff described the plaintiff's delusions as "baseline" indicating that, even with medication compliance, the plaintiff is typically animated by delusional thinking (Tr. 304-305). The ALJ did not address the fact that some of the plaintiff's delusions involved mistrust of others and paranoid ideation (Tr. 302, 304, 320). The plaintiff generally stayed by herself because others did not understand her (Tr. 262), and she told BCMHC staff that, "People don't like living with her. That leave her kinda homeless" (Tr. 266). With regards to both her social functioning and concentration, persistence, or pace, the plaintiff argues that the ALJ erred in relying too heavily on the consultative examination by Dr. Spivey (Tr. 11; *see* Tr. 277-79). The plaintiff contends that the ALJ did not adequately consider evidence showing that she alternated between periods of intense activity and periods of abnormally low activity (Tr. 260). Notably, even Dr. Spivey found the plaintiff's concentration was "fair to poor (Tr. 279).

The plaintiff further argues that, even if her impairments did not meet Listings 12.03 or 12.04, the ALJ erred in failing to properly consider whether her hand impairment was "of equal medical significance" to the missing criteria and in failing to consider her impairments in combination (pl. brief at 14-16). *See* 20 C.F.R. §§ 404.1526, 416.026 ("If you have a combination of impairments, no one of which meets a listing, we will compare your findings with those for closely analogous listed impairments. If the findings related to your impairments are at least of equal medical significance to those of a listed impairment, we will find that your combination of impairments is medically equivalent to that listing."). When, as here, a claimant has more than one impairment, the ALJ must consider the severe and nonsevere impairments in combination in determining the plaintiff's disability. Furthermore, "[a]s a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).

It "is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity.... [T]he [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them." *Id.* (citing *Reichenbach v. Heckler*, 808 F.2d 309 (4th Cir.1985)).  The ALJ's duty to consider the combined effect of the plaintiff's multiple impairments is not limited to one particular aspect of its review, but is to continue "throughout the disability determination process." 20 C.F.R. §§ 404.1523, 416.923.

The Commissioner contends that the plaintiff failed to adequately develop these arguments, and thus the court should reject them outright (def. brief at 9-10).  The undersigned disagrees and finds that the plaintiff adequately raised and developed these arguments.  The Commissioner further argues that the ALJ evidenced sufficient consideration of the issue of medical equivalency in the statement, "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments . . . " (Tr. 11).  However, the ALJ's listing analysis contains no discussion of medical equivalence (*see* Tr. 11-12).  The Commissioner also contends that the ALJ adequately considered the plaintiff's impairments in combination by "discuss[ing] Plaintiff's multiple impairments and alleged associated limitations in concert throughout his decision" (def. brief at 10 (citing Tr. 11-15)).  However, again, the ALJ's step three listing analysis contains no discussion of the combined effects of the plaintiff's impairments.

Here, as in *Saxon v. Colvin*, C.A. No. 6:10-1155-RMG, 2013 WL 4051037 (Aug. 9, 2013), "with the exception of a passing reference to considering the 'claimant's severe impairments, or a combination thereof,' there was no specific analysis or discussion of the cumulative effect of the claimant's three severe impairments." *Id.* at *3.  Also as in *Saxon*, "[t]his failure to consider and explain the cumulative effects of these severe

16

impairments, . . . appears particularly significant here because the Plaintiff's [bipolar disorder, schizoaffective disorder, and right hand injury] . . . certainly present the type of combined effects of multiple impairments that could constitute the medical equivalent of a listing or might otherwise satisfy the legal requirements for disability under the Social Security Act." *Id.* Accordingly, upon remand, the undersigned recommends that the ALJ be instructed to reconsider all the relevant evidence with regard to the paragraph B criteria of Listings 12.04 and 12.05 and further to consider the combined effects of the plaintiff's impairments and whether they constitute the medical equivalent of a listing.

In light of the court's recommendation that this matter be remanded for further consideration at step three of the sequential evaluation process, the court need not address the plaintiff's remaining issues, as they may be rendered moot on remand. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir.2003) (remanding on other grounds and declining to address claimant's additional arguments). However, if needed, the ALJ should also address these additional allegations of error raised by the plaintiff:  the ALJ erred in evaluating her credibility by failing to consider her poor insight and her well-documented tendency to overstate her abilities; the ALJ erred by placing too much reliance on her GAF scores without consideration of the accompanying treatment notes; and the ALJ erred in giving significant weight to the opinions of the consultative examiners, Drs. Spivey and Rodriguez-Scott, because neither gave any indication that they reviewed any of the plaintiff's medical records, and Dr. Spivey appeared to base his impressions entirely on the plaintiff's own understatements as to her symptoms (pl. brief at 16-21)

## **CONCLUSION AND RECOMMENDATION**

Now, therefore, based on the foregoing, it is recommended that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald<br>
United States Magistrate Judge

April 15, 2015
Greenville, South Carolina